May it please the court Lawrence Rolfing on behalf of Martin Rincon. This case involves three discrete questions about the treatment of Mr. Rincon's application for disability benefits. The first one turns on the dot the the residual functional capacity assessment for the physical requirements of work. Dr. Ross the treating physician stated that Mr. Rincon could stand and walk for two hours a day and could engage in no stooping and other activities because of his need for a cane. The ALJ found that Mr. Rincon could in fact stand and walk for two hours a day and stated that the treating physician's opinion was not supported by the longitudinal record. Well the regulations tell us that a limitation of standing and walking two hours a day is at best a violation of the treatment pretty significant limitation. You have a lot going on and a lot a lot of objective evidence to erode the ability to stand and walk down to two hours a day and to find a knife that will cut between the difference between one hour and two hour saying that it's not supported by the longitudinal record these are contextual reasons specific and legitimate reasons supported by substantial evidence is contextual and it flexes from case to case and fact pattern to fact pattern. So okay so that's the case but the vocational expert only focused on sedentary work and that's what she found. Correct. So so in a way although the point can be made as you have in fact the sedentary work that she said existed and was was such that if he was sitting he wouldn't be standing he wouldn't be stooping so your issue would not really be relevant. The commissioner has construed the the administrative notice provisions of 404 1566 D and 416 966 D to find that the vocational expert can deviate from the dictionary of occupational titles and in this case the vocational expert is consistent with the DOT but the end of that ruling says the vocational expert may or the vocational can do whatever he or she wants to but the ALJ cannot accept testimony from a vocational expert that's inconsistent with agency policy. In the broad range of unskilled 137 unskilled sedentary jobs only six of them are rated in the DOT as requiring any any significant stooping yet the commissioner in 96 9p tells us that a complete inability to stoop will significantly erode the unskilled sedentary occupational base and ordinarily result in the finding of disability. The vocational expert has to explain herself when she deviates from the DOT. The commissioner doesn't. The commissioner takes administrative notice of of her experience in adjudicating 2.8 million claims per year and when the commissioner tells the general public the people that are claiming benefits that the complete inability to stoop is going to have such a significant erosive impact on the ability to engage in sedentary work and a vocational expert... So are you saying that the administrative law judge should have just rejected all of that based upon that ruling and in this case I don't believe as I recall that Mr. Rencone's lawyer made an objection or found that the the or objected to the qualifications of the expert in any way. That would be me. Oh that would be you okay I don't recall that. Did you? Did you ask to have the witness excluded because she could not make a the or give opinion testimony? There's a difference between your honor with all due respect there's a difference between objection objecting to someone's qualifications to testify and object and and arguing that their testimony isn't substantial evidence and this vocational expert is has the the the bulk provider agreement from the agency the region assigns and qualifies vocational experts the she testifies before ALJs on a regular and frequent basis she has the CRC and the vocational rehabilitation credentials to be an expert to know about work but that doesn't mean that her testimony is always going to be consistent with agency policy. Is that the argument you made below to the ALJ? Did you say to the ALJ no matter what she says it's irrelevant because of this policy that exists? I argued that the I mean did you offer that or at the time or are you that's just I believe I argued that the ruling is contrary that 96 9 p states that the that the inability to stoop does erode the vocational base and I believe I cross-examined the vocational expert on that specific issue. But erode is a matter of law so if that were that was the case that presentation should have been made to the ALJ and the testimony should have been excluded because it would be irrelevant. Well whether or not testimony is substantial evidence is a question of law in the Appeals Council the District Court in this quarter said an equal ability to to assess the legal effect of testimony rendered. This court reviews the ALJ's findings for substantial evidence but we review the legal sufficiency of a decision de novo. The claimant in this case Mr. Rincon the claimant in any case is entitled to have this court tell not only the claimant but the agency and the and this court beginning in Van Han versus Bowen stated that that the rule although the rulings do not have weight of law they're not regulations are not part of the statute they are entitled to Chevron deference and unless they're plainly erroneous this court defers to those rulings and its understanding of what the regulations mean and when the regulation as understood by the that the inability to stoop ordinarily is going to warrant the finding of a disability once we've restricted the person to sedentary work that understanding of the regulatory framework always has to be enforced counsel can I just shift our focus a little bit I thought we were going to looks like dr. Patrick Liano's testimony was viewed as more appropriate more credible and contradictory to dr. Ross's it seemed to me the ALJ did a rather thorough job of indicating why the one opinion overrode the other why dr. Ross's opinion was not entitled to carry the day isn't that all that the ALJ is required to do in this situation well the ALJ read dr. Patrick Liano's opinion as as not requiring a cane and eventually said that that her opinion was consistent with dr. Patrick Liano's but the doctor the consultative examiner clearly stated that he could that mr. Rincon could not engage in stooping because he needs a cane and that's on page 379 of the record which doctor was that that's the the board eligible orthopedic surgeon that did the consultative examiner at the request of the state agency you don't remember his name you don't remember his name Patrick Liano yeah Patrick Liano that's the doctor that judge Smith was was just mentioning but basically he dr. Patrick Liano his views conflicted with Ross's in several ways and the ALJ took those views and went through dr. Ross's testimony and used dr. Patrick Liano's views to say I don't agree with Ross on this that I agree with us on that this is what I'm relying upon is this contrary physicians view that's all the require isn't it legitimacy requires viewing them in context dr. Patrick Liano said that you're so you're talking about the weight I'm talking about substantial evidence right but really I don't gave substantial evidence right yes okay so then the question is the ALJ says okay dr. Ross gave this testimony dr. particularly I don't gave something else they each had substantial evidence I the ALJ I'm gonna look at this I view dr. Patrick Liano's testimony and the evidence that he provided as being more persuasive to me for the reasons indicated and over dr. Ross's that's all over the system requires isn't it the reason the reasons that the ALJ articulated were that the the weight of the evidence the the longitudinal view of the record well I was one of them now and and that isn't a very good reason once we're talking about the difference between one hour and two hours a day it just isn't substantial I thought dr. Ross was a treating physician he is and so his opinion is entitled to more weight right what his letter was August 13th 07 that right that at least that's what it's dating he has one in 08 he had he wrote him yes he did write a letter in 07 he also wrote or signed off on a medical source statement in in 07 08 that's the questionnaire yes and that when did he do that the questionnaire I couldn't is at oh I see me 229 08 is when he signs that questionnaire correct that's it page 350 he signs it on page 354 of the record in 08 so how long did he so when he did the 07 letter how long had he been how long had Rincon been treating with him I don't think the record is clear on that I he had a gap between treatment in 05 and 07 it looks like he picks up in 07 with dr. Ross and he's with him until at least 2008 when dr. Ross renders the second opinion and dr. Ross describes the condition as progressive atrophy of the extremity related to the gunshot wound from the letter you can't really tell how long he's been treating this August 13th 07 letter well the ALJ found that that that mr. Rincon started treating in 07 there's no evidence to the contrary for that and so that that I think we're I'm stuck with that finding regardless of when some something else may show so I think the court should assume that he fills out the medical source statement in 2008 that he's he's has about a year of treatment history with mr. Rincon when he expresses the opinion that it's one hour of standing and walking no stooping he had some treatment between 2008 and 2011 but it wasn't by dr. Ross right correct it was by other physicians there's one record that says he doesn't have atrophy most of the to having a severely antalgic or antalgic gait that he doesn't flex his knee when he just swings his leg around he's not walking in a normal he's at a trend and bull gate he's got a lot of abnormalities that are reflected in the treatment but it's not absolutely clear that he couldn't stoop or he couldn't stand it's not as if it was as clear as it was to dr. Ross in that records that are there that that's would support dr. Ross as opposed to dr. pigliano well the only inference that flows from the evidence that we have on the record is that we have a progressively deteriorating condition when he's released from surgery in 05 the doctors are projecting that he's going to be able to ambulate and walk and in a relatively normal fashion post gunshot wound by the time we get to 07 and 08 when he's treating with dr. Ross is describing a precipitous decline in his functioning and the subsequent records show that his gait never improved there's one reference to the country but in general his gait never improved in the act the muscle atrophy never recovers he loses he's losing muscle mass and his gait is getting worse and that's exactly what dr. Ross described in 2008 and by dr. Patrick said it's not dark gray it's only medium gray it's a shade of gray apart can I get just one clarification about the record on the mental health part of his claim yes he apparently was sent back down by the by the Appeals Council to further develop the record I guess I'm not sure exactly why they sent it back down but they asked the LJ to take a further look at the mental health issues is that right that's correct okay so then it there apparently there were no further examinations that were done and when it came back down and instead they had the expert testify at the hearing dr. Peterson yes now there's some reference in the in the documentation to a dr. Coughlin Coughlin Coughlin yes who with whom he apparently had been treating that right he saw a number of doctors at LA County Mental Health and Exodus and I believe that's one of the doctors that's that's treating him the the wreck did what I could tell there were you sent some after the ALJ's decision in this case yes you sent some records to the regarding dr. Coughlin to the Appeals Council is that right I believe I did your honor I put those records were not before the ALJ because because the ALJ makes a statement that there's no evidence of ongoing one-on-one treatment right and dr. Coughlin's records seem to for a period of time prior to the hearing that he did in fact have some some treatment right and at the hearing he testifies that he was getting some treatment that's correct but he was testimony was was discredited I gather primarily because we didn't have the records they weren't before the ALJ they weren't there for dr. Peterson to review and dr. Peterson was relying on a pretty sparse record of treatment which this court in Wynn versus Chater is recognized is not surprising in in the in the prior to the hearing there is some reference to dr. Coughlin in the I guess it's the records from the Harbor Medical UCLA Harbor yeah I believe there's in one of the it's with the mental it's with the social worker in any event it notes that that he's seen dr. Coughlin one of the records and those records were available to dr. ritvo and he references them at page 518 of the record in express anybody did anybody explore what this the extent of his of his consultations with dr. cotton were you that was not explored your honor you didn't do that after these pills counsel sent it back down for that very purpose to clarify what his mental health status was I I know that there were records that were well we know after the fact that he was seen dr. cotton correct there were records from Harbor UCLA that were presented before the hearing and those but there's it's just two pages that's all we were able to get that was presented to the ALJ you know we request records the subpoenas are very difficult to get from the agency it's just we do the best we can and we present the records well nobody asked him at the hearing if who he had he testified that he was seeing somebody correct nobody asked him who are you seeing how many times you see him what day do you see him you see him once a week twice a week every other week once a month nobody asked him any questions like that and yet we'll hear from the government that's a thank you good morning Shea bond on behalf of the government Commissioner of Social Security I would like to respond first to the the argument regarding dr. Ross I believe your honor had a question about the level of treatment I think that dr. Ross had provided yes at the time of I guess the first letter yes if you look at the this is exhibit B to F of the administrative record I believe it starts on page 358 and it goes on for several pages that lists dr. Ross's treatment records if you look at the last page of that exhibit it's 369 you have a date of December 2006 and then the next date is June of 2007 so at the time that dr. Ross had written the first letter it appears that there have been maybe two visits two visits and then I think the total amount of treatment visits with dr. Ross over this two-year period I guess was about seven visits so but when you look at dr. Ross's treatment records they're very sparse when it and complained of I think he complained of neck pain a few times and then knee pain maybe once or twice the objective findings are just very limited the dr. Ross says that the claimant is in no acute distress there's really no testing of like ranges of motion he did notice that there was some tenderness in the neck some crepitus in the knee but there's there's nothing that justifies the level of limitation that's described in that first 2007 letter and then the 2008 there's just he did examine apparently correct well yes presumably he examined him but why isn't he able to draw some conclusions from his his examination well the doctor can draw conclusions but when we're looking at opinions regarding functional limitation are the commissioners regulations say they have to be justified by objective findings and so the objective findings we have here are going to be the contemporaneous treatment records that this was it so we know we know for a fact that he had you know the gunshot correct and he had some serious surgery and he had metal he had rods in his like to correct to correct the fracture and he was still having problems yes he came in and he complained really seems to dispute that well no and neither did the ALJ I mean when you look at the RFC finding it's very restrictive it's a it's a sedentary with stand and walk and sitting he's able to use or he's required or allowed to use his cane we have lots of limitations on postural movements so yes the ALJ absolutely believed that this was a significant limiting impairment but when we're turning to the question of the legitimacy of dr. Ross's opinion which had more much more restrictive limitations and I do disagree with counsel that dr. Ross's opinion is almost identical to dr. believe it's Petra Leone pronouncing that correctly the there's the one hour versus two hours of standing and walking and then there's also the one hour that dr. Ross assessed for sitting as opposed to the six hours that dr. Petra Leone found so there's actually really is quite a difference between those two opinions but again getting back to the legitimacy of dr. Ross's opinion we have to look to see what objectives would have supported the the extra limitations and so we go and we do look at the contemporaneous treatment records and a doctor will typically write down the types of limitations they would see on a clinical examination in those records now given the limited number of times that dr. Ross had actually examined the claimant you would think that the doctor would record any kind of extreme limitations like the limitations in this significant muscle muscle atrophy or the significant ranges of motion limitations that he describes later on in his letter and in the questionnaire they simply just do not appear in those contemporaneous treatment records and that is what the ALJ identified as one of the reasons for finding that dr. Ross's opinion should be afforded less weight than say dr. Petra Leone who had the very detailed clinical findings during his examination and I would also point out that the the ALJ also afforded weight to our state agency reviewing physician who had looked at the evidence for the for the physical impairments that was dr. I think it's Hucy or Hucy I don't know if I'm pronouncing that correctly but that's on page 42 of the administrative record where the ALJ is saying that our state agency doctor also confirmed dr. Petra Leone's opinion and examination and the types of limitations to claim it would have between 2008 and 2011 there's really a he didn't see dr. dr. Ross or dr. Petra Leone and so it does that does the evidence that it was there for that period of time support one position or another I'm sorry could you repeat the last part today who does it does it support the which of the doctors does it support if it supports either of them well I it doesn't support dr. Ross's opinion because again the the the later treatment records we do have it the the claimant coming into and complaining of certain pain or problems that he's having but again when you look at the objective findings the clinical findings that were recorded contemporaneously they just don't rise to the level of supporting dr. Ross's opinion it would support dr. Petra Leone and what our state agency's view of that record would have would have been I understand and the records show that he received pain medication that was basically it in correct I would also just just wanted to touch on what mr. Rolfing was talking about with the Social Security rulings and the vocational experts testimony I think mr. offing is misunderstanding the the Social Security rulings in this case they don't mandate specific findings this the ones that were in play in this case which is 96 dash 9p 83 dash 12 and 83 dash 14 they all say that when a residual functional capacity either falls between two exertional levels or there are additional non exertional limitations which we had here like the use of the cane or limitations on balancing they direct the ALJ to obtain vocational expert testimony because there is an open-ended question about what kind of limits these RFC limitations are going to have on the occupational base and so the ALJ did exactly what she was supposed to do here which was to consult with a vocational expert who then explained yes there are jobs that this particular claim can do within this residual functional capacity and if there are no further what about what about the about dr. Cochran the those those records that the later records the later work they go to the Appeals Council right this is you're talking about after the first no after the second hearing after the second hearing oh I see what you're saying yes and so what the impact of those records what we know from that from after the fact that he was seeing somebody on a regular basis for mental mental impairment for his psychosis yes and you know he had he had seen had sought treatment prior it was very minimal one of the things so that the ALJ noted was that that he had not been receiving one-on-one treatment well the which dr. Peterson testified to at the at the hearing oh yes was the way in which you deal with his problem is you would go one-on-one with with a psychiatrist or a psychologist correct and when the medical expert was reviewing the record which is what the Appeals Council had instructed to do on on remand was to take a look at this additional evidence call a medical expert to to give an opinion and that's exactly what the medical expert did here and so that medical expert after reviewing the the records but he didn't have dr. Cochran's no if that if it was the later submitted to the Appeals Council then no but there's there's a level of consistency consistency here in the record overall where we had during the relevant period we had four doctors to were examining doctors to were reviewing one being the medical expert and one being our state agency doctor who after examining the claimant and reviewing what they had determined that the claimant had either no or mild mental limitations so that was very consistent throughout the record the additional records that were submitted to the Appeals Council would not have would not have changed that well we don't know that what we don't know what dr. Cochran might might have said if somebody had contacted her to get her records or him and get his records whoever it was well that is it's plaintiff's burden ultimately to prove their disability claim isn't it also the ALJ's burden to develop the record well the ALJ was following nobody asked him when he testified at the hearing that he was seeing a psychiatrist one-on-one you mean the claimant the claimant nobody asked him who are you seeing and and claimant had counsel at the hearing who absolutely could have asked those questions if if counsel and plaintiff thought that was relevant to the application that that's not the government's responsibility is it to develop the record in that manner isn't that the claimant's responsibility at all again absolutely it is ultimately the claimant's burden to support their application for disability obviously this this claim had been remanded as it were by the Appeals Council for specific consideration of this mental impairment issue therefore counsel and the claimant were aware that this was at issue and absolutely could have fully developed that at the record well but the case law and the regulations also provide that even if they're represented by counsel the ALJ has an obligation to fully develop the record and I mean and I would submit I'm sorry what does that mean in response to my coat my colleagues at view what what does that mean if the ALJ has the responsibility to develop the record what does that mean in practical terms well in terms of what the circuit law says it's it's what the record is ambiguous and here we don't really have an ambiguous record that was before the ALJ at that time we had a record again that had four medical opinions that assessed the claim with no to mild limitations there was very little in terms of treatment for the mental impairment we had the the ALJ was specifically following the instructions from the Appeals Council to have the medical expert review this record and ultimately the claimant was represented by an attorney at the hearing who could have developed this record as well there was basically nothing else for this ALJ to do based on this record it was not it was not an ambiguous ambiguous Peterson's testimony is less than clear I'm sorry could you repeat dr. Peterson's testimony is less than clear well dr. Peterson was saying that based on the record that was before him this was the best conclusion he could come up with because there were inconsistencies the you know the consultative examinations actually sees me at both consultative examinations being very vague and evasive the one consultative examiner who had the more thorough narrative report was explaining that he was actually exaggerating his condition and it was really suspected that he was doing it in order to get disability benefits from the government she that was dr. Cheryl she drew that conclusion so you know when the agency sends the claimant for multiple consultative examinations and has our state agency doctors reviewing the record that is that is how the agency attempts to develop the record ultimately the claimant if the claimant had additional records to submit the claimant through counsel should have submitted that to the agency at the at the appropriate time let me ask you a question about the vocational expert and what she relied on counsel has said that that the information that she had to establish that he could do sedentary work was was not enough or was inaccurate and there was a colloquy between counsel and and the vocational expert about the browser that was used and you know I'm frankly unclear as to what she was doing relying on and what counsel was relying on in order to for him to establish for her to establish that it was reliable and for counsel to try to in the record will establish that in fact these jobs were available it seems kind of interesting to me that the the vocational expert can come up with 2,000 stone setters and 70,000 are locally that would be in LA 70,000 nationally at the time so that's pretty dramatic in my point of view and this was challenged so why is the record clear from your point of view that in fact the vocational expert was correct well I think the record is clear because the question that Mr. Rolfing was asking the vocational or the numbers that Mr. Rolfing was presenting at the at the hearing sensibly off the job browser pro software the vocational expert kept explaining to him that he was looking at the wrong numbers so she said those numbers that you're talking about represent categories of like of occupations not the jobs within each occupation that she identified so say he's taking for example the stone cutter a stone setter position she was identifying 2,000 jobs within a particular category of job and so when mr. Rolfing kept saying well I'm showing you the software and this says you know whatever numbers he was coming up with there no there no occupations within the state of California only seven nationally I know those aren't the exact numbers but just for an example and she said well you're looking at employment not job numbers so she was trying to redirect him to saying this is what I'm identifying and under the case law of the circuit under Bayless it's the vocational experts own expertise that is the foundation for the basis of identifying the job numbers now I would like in what was she relying on though I'm very curious as to how she came up with this by her particular browser versus well she she never testified at the hearing that she was actually that when mr. Rolfing posed the question to say do you use job browser pro in your practice in general she said yes but she never said that she used what did she what did she say she used it's gonna be it's gonna be her own I'm sorry I didn't mean to interrupt that's okay it was gonna be her own experience the fact that she said she observed later on the testimony she talks about life I've observed like bench bench assembly jobs like I that's what she does and that's what the vocational experts testimony is based upon their qualifications except that she got very specific a stone setter an account you know somebody who does some kind of a review accounting expertise but I don't know that anywhere in the record how she came up with that well under Bayless the the controlling circuit precedent she doesn't have to it's the challenge in Bayless was that the the plaintiff said well we don't know how the ex the vocational expert came up with these numbers because it wasn't identified at the hearing and this court in Bayless said that's that's not required it's it's a fact that the vocational expert is recognized as an expert in this area and it's just the experience the expertise that is is sufficient which was never challenged correct and and the the questioning that mr. offing presented on job browser pro was asking the wrong question was focusing on the wrong on the wrong job numbers he was looking at categories of occupations not the actual job numbers within those particular occupations thank you miss bond thank you very much we ask that you affirm I'm not sure that you had any time we appreciate your arguments
judges: Paez, M. Smith, Silver